# IN THE UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION

| | | |
|---|---|---|
| CITY OF DAYTON OHIO, <br> 101 West Third Street <br> Dayton, Ohio 45402, <br><br> Plaintiff, <br> v. <br><br> UNITED STATES OF AMERICA, <br> c/o Vipal J. Patel, Acting U.S. Attorney, <br> U.S. Attorney's Office for the S. Dist. of Ohio <br> 303 Marconi Boulevard, Suite 200 <br> Columbus, OH 43215, <br><br> Defendant. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : | Case No. _____ <br> Judge _____ <br> Magistrate _____ <br><br><br> **FTCA COMPLAINT** <br> **28 U.S.C. §§ 1346(b)(1) & 2674** |

Now comes the Plaintiff, City of Dayton, Ohio (hereinafter "the City" or "Dayton") to file this Complaint under the Federal Tort Claims Act ("FTCA") against the United States of America (hereinafter "the United States") to recover past, present, and future damages caused by ongoing contamination of the City's drinking water supply (including its wellfield and surrounding property, production and sentinel wells, and untreated and treated water) with per- and poly-fluoroalkyl-based substances ("PFAS") disposed of at, or otherwise released at, the U.S. Department of the Air Force's Wright-Patterson Air Force Base ("WPAFB" or "the Base"), addressed at 88th Air Base Wing, Wright-Patterson Air Force Base, 5135 Pearson Road, Wright-Patterson AFB, Ohio 45433. As of the date of filing of this Complaint, WPAFB has taken no action to stop or even mitigate the ongoing migration of its PFAS contamination into the City's wellfield and water supply, nor has agreed to pay for, reimburse, or otherwise offer to share any of the monetary damages incurred by the City in response to the contamination.

## THE PARTIES

1. Plaintiff, City of Dayton, is an Ohio municipal corporation with its principal office

located at 101 West Third Street, Dayton, OH 45402.

2. Defendant, United States, is responsible for the U.S. Department of Defense and its armed services branches, including the U.S. Air Force and its Air Bases, including WPAFB. WPAFB is operated by the U.S. Air Force, a branch of the U.S. Department of Defense, and is located adjoining the northeast boundary of Dayton, Ohio, with operations in both Montgomery and Greene Counties, Ohio. Under Rule 4(i) of the Federal Rules of Civil Procedure, Defendant's address for service is the U.S. Attorney's Office for the Southern District of Ohio, 303 Marconi Boulevard, Suite 200, Columbus, OH 43215.

**BACKGROUND FACTS**

3. Dayton provides potable water to over 400,000 residents, businesses, and contract customers. The City's service area includes most of Montgomery County, Ohio, including the Cities of Dayton, Kettering, Riverside, Centerville, Trotwood, and Brookville, and Harrison Township; customers in Greene County, Ohio; and service to the Dayton International Airport as well.

4. The City's distribution lines extend over 50 square miles and carry an average of 65 million gallons each day. The City's Water Department operates wellfields in the Great Miami River and Mad River basins that include production wells supplying groundwater to two water treatment plants, one lime recovery facility, two main pumping stations, six booster pumping stations. and eleven water storage facilities. Surrounding the City's production wells are hundreds of monitoring wells ("sentinel wells") installed as an early warning system for detecting potential contaminants in groundwater that may be migrating into the capture zone of the production wells.

5. WPAFB's operations are located upgradient of the City's Mad River wellfield. In some locations, the operations are no more than a mile or so from the nearest City production well, and

closer than that from many early-detection sentinel wells installed by the City.

6. Dayton relies solely on groundwater for its source of drinking water. There is no other source if the aquifer becomes contaminated and unusable. In order to protect the aquifer, the City successfully petitioned U.S. EPA in 1988 to designate the aquifer as a "sole source aquifer" under Section 1424 of the Safe Drinking Water Act, the first such designation in the Midwest. The sole source aquifer that provides drinking water to the City also serves as the source of drinking water for over 2.5 million residents and businesses in Southwestern Ohio.

7. For many decades, representatives for WPAFB have known that the City relies on its sole source aquifer for drinking water; that operations at the Base were located inside designated one and five-year protection zones surrounding the City's Mad River Wellfield; and that operations at the Base therefore had the potential, if not properly managed, to contaminate the aquifer that provides the sole source of water for the City's drinking water system that supplies water to over 400,000 residents, businesses and contract customers.

8. WPAFB's records indicate that it began using PFAS-containing aqueous firefighting foams ("AFFFs") in 1970 to extinguish aviation fuel-based and oil-based fires, and to conduct firefighting training exercises.

9. Upon information and belief, thousands of gallons of PFAS-containing AFFF concentrate were stored each year at the Base and used for decades in fire suppression and regular firefighting training exercises. WPAFB's use of these AFFFs to extinguish fires and in firefighting training exercises occurred under circumstances where little or no steps were taken to minimize the potential for significant runoff of AFFF residues onto the ground and into surrounding soils and nearby surface waters.

10. Beginning as early as 1973, information became known to, or at least readily

3

available to, WPAFB, indicating that PFAS-containing AFFF were toxic and environmentally persistent. For example, in 1973 the U.S. Air Force issued a report finding that the foam was toxic to aquatic life and not biodegradable, and stating that Air Command environmental coordinators expressed concern for disposing of AFFFs after use. In 1974 the U.S. Air Force issued another report confirming these findings and recommending that wastewaters from firefighting operations be collected and treated before discharge.

11. In March 2011 the Department of Defense's ("DOD") Materials of Emerging Regulatory Interest Team issued Risk Alert # 03-11 to all military branch environmental coordinators stating, among other things, that (a) the discharge of PFAS-containing AFFF was regulated under the federal Clean Water Act; (b) potential liability for the release of such foam needed to be weighed against the cost of disposal and resupply with alternative chemicals; (c) uncontrolled, repeated application of PFAS-containing AFFF at fire training areas could be expected to contaminate soil and groundwater, and thus such activities needed to be managed; and (d) containment, treatment, and proper disposal of foam discharges through the use of lined pits and improved wastewater treatment were recommended.

12. WPAFB knew at least as far back as early 1988 that its use of AFFF and, more specifically, the lack of sufficient controls over the handling of residues created from fire suppression activities and firefighting training exercises, had contaminated many areas at the Base. In February 1988 WPAFB entered into an administrative order with Ohio EPA that obligated the Base to investigate and potentially remediate more than 30 separate waste disposal areas, including numerous past and current fire suppression areas and firefighting training areas identified by the Base itself as potentially contaminated areas.

13. To fulfill obligations under the February 1988 order, WPAFB conducted a

4

preliminary assessment of 50+ areas at the Base known or suspected to be sources of PFAS contamination, starting sometime in early 2015. A final preliminary assessment report was issued in September 2015.

14. The 2015 preliminary assessment report concluded that PFAS contamination had been documented, in terms of mass of PFAS released, at 25 different areas at WPAFB sufficient to warrant a formal site investigation. Importantly, the report stated that contamination in four areas was just over a mile upgradient of the City's Mad River Wellfield production wells; was inside the City's wellfield protection zones; and was so significant that it warranted classification as "Group 1," denoted in the report as "High mass of AFFF released and probability of groundwater contamination."

15. Sampling by WPAFB in 2014, 2015, and 2016 of *finished* drinking water supplied by the Base to its own residents and employees revealed the presence of PFAS at concentrations as high as three times greater than U.S. EPA's 2016 Health Advisory Level for PFAS. The corresponding concentrations in the groundwater that supplied the production wells at the Base could only have been substantially higher.

16. In response to Ohio EPA's receipt of this sampling data, emergency measures, including mandated health advisories, supplying of bottled water, and shutting down impacted on-site wells, were ordered by the Agency in two May 2016 emergency orders issued to WPAFB.

17. On June 2 and 20, 2016, Ohio EPA issued follow-up letters to WPAFB under the emergency provisions in the 1988 administrative order between the Agency and WPAFB, directing the Base to undertake "an expedited removal action…to ensure that PFAS detected in ground water at the Base are prevented from affecting…the downgradient City of Dayton production wells."

18. In the almost five years since the June 2016 letters were issued by Ohio EPA to

5

WPAFB, the Base has never proposed, developed, designed, or implemented any removal action to stop PFAS detected in groundwater at the Base from migrating into and adversely affecting the City of Dayton's Mad River Wellfield.

19. Because WPAFB never undertook the removal action directed by Ohio EPA, in order to minimize the imminent threat to the City's water supply, Ohio EPA advised the City to shut down seven production wells closest to WPAFB, which the City did to protect its residents, resulting in the City immediately losing 33% of its production capacity from its wellfield. Because WPAFB has taken no action to stop the ongoing migration of its PFAS contamination into the City's wellfield, these seven production wells have remained shut down for more than four years.

20. In addition, at Ohio EPA's direction, the City began quarterly testing for PFAS in its early detection sentinel wells located between its production wells and WPAFB. At the Agency's request and the recommendation of the City's drinking water consultant, the City installed more than 100 additional sentinel wells in the geographical area between the City's wellfield and WPAFB in order to increase the ability to detect migration of PFAS-contaminated groundwater from the Base into the cone of influence for the City's production wells.

21. Since beginning its monitoring program in mid-2016, the City has consistently detected PFAS above U.S. EPA's 2016 Health Advisory Level in sentinel wells through the date of filing of this Complaint. These levels also exceed U.S. EPA's December 19, 2019, recommended groundwater preliminary remediation goals for the two most common members of the PFAS family of chemicals.

22. Late in 2017 the City also begin detecting PFAS in other active production wells located further downgradient from WPAFB, and the City continues to consistently detect PFAS in these wells as of the date of this Complaint. Although levels in these active production wells have

6

not been above U.S. EPA's 2016 Health Advisory Level or its 2019 recommended groundwater remediation guidelines, they are above other health-based drinking water standards and action levels adopted for PFAS in the past three years in as many as 10 other states, and also above the recommended safe level proposed by the Center for Disease Control in 2018.

23. As a consequence of the PFAS contamination that continues to migrate from the Base into Dayton's wellfield, the City was forced to develop and implement a detailed, expensive pumping/blending program with its remaining production wells in order to reduce PFAS levels in raw and treated water. Despite this program, *finished* water from the City's treatment plant consistently shows PFAS levels as high as 15 parts per trillion, higher than many of the health-based drinking water standards and action levels adopted for PFAS in the past three years in many other states.

24. When WPAFB continued to not comply with Ohio EPA's May 2016 orders, the Agency issued an additional order dated January 29, 2018, that directed WPAFB once again to prepare and submit a plan to stop the ongoing migration of PFAS into the City's wellfield. The letter contains the following passage:

> While WPFAB has developed a sentinel monitoring well network and continues to monitor the ground water, WPAFB has not taken any steps to prevent PFAS contamination present at WPAFB from migrating beyond your boundary, nor evaluated any actions that could prevent surface water contamination present at WPAFB from impacting the city of Dayton's Mad River drinking water wellfield. Further, you have taken no action to prevent further impacts to WPAFB's Area B water supply. Adding to this list of issues, we now know that PFAS contamination has been detected in the raw water at Dayton's Ottawa Drinking Water Treatment Plant. This plant is directly in the migration path of contaminated ground water emanating from WPAFB.
>
> This lack of urgency to take additional appropriate action is very concerning. And while we wish to continue to work collaboratively with WPAFB on a solution, I feel compelled to require immediate action on your part to protect the ground water, which is also the primary source of drinking water not just for WPAFB, but for 1.5 million people that live in and around the city of Dayton.
>
> Specifically, I find it appropriate to hold WPAFB in violation of Chapter 6111.04 of the Ohio Revised Code (ORC), which states in pertinent part:
>
>> (A)/··· (1) No person shall cause pollution or place or cause to be placed any sewage, sludge, sludge materials, industrial waste, or other wastes in a location where they cause pollution of any waters of the state.
>>
>> (2) Such an action prohibited under division (A)(1) of this section is hereby declared to be a public nuisance."

25. Instead of taking action expeditiously to address the ongoing PFAS contamination

7

of, and ongoing imminent threat to, Dayton's water supply, WPAFB's response to the contamination, and to Ohio EPA's letters and notices of violation has been limited to a series of on-site monitoring and investigations lasting over four years, culminating in a decision in December 2020 to engage in yet another series of lengthy investigations that, per WPAFB's own estimate, will not result in any potential removal or remedial actions designed to reduce, much less eliminate, the ongoing PFAS contamination of the City's wellfield and water supply, or stop the ongoing threat to the City's water supply, for at least the next five years or longer.

26. In an effort to avoid filing this FTCA Complaint, and in response to WPAFB's continued refusal to take action to eliminate or even reduce the ongoing PFAS contamination of the City's wellfield and water supply, the City sought relief in the spring of 2020 under Section 332 of the National Defense Authorization Act ("NDAA") for Fiscal Year 2020, signed into law on December 19, 2019.

27. The NDAA requires that, upon request from the governor of a state, the Secretary of Defense shall work expeditiously to enter into a cooperative agreement to address testing, monitoring, removal, and remedial actions relating to the contamination or suspected contamination of drinking, surface, or ground water from PFAS originating from activities of the DOD. The NDAA also provides that when DOD is authorized to expend funds for the purpose of addressing ground or surface water contaminated by PFAS the Secretary of Defense may enter into such cooperative agreement directly with the local water authority with jurisdiction over the contamination site, including a public water system.

28. Recognizing the significance of the threat to the City's water supply, at the request of the City and the Ohio EPA, Ohio Governor Mike DeWine sent a letter dated August 27, 2020, to the Secretary for DOD, requesting a cooperative agreement under the NDAA, and summarizing

the significance of the contamination and the importance of the sole source designation for the aquifer that supplies drinking water for millions of people. The Governor ended his letter with "I look forward to hearing from your office as soon as possible so that we can begin moving expeditiously with the City of Dayton and WPAFB on a cooperative agreement to protect one of the Ohio's most vital water resources."

29. Hearing no response, Ohio Governor DeWine sent a second letter to the Secretary, dated January 8, 2021, reiterating his request, stressing the urgency of the matter, and referencing a series of interim projects proposed by the City and Ohio EPA to WPAFB that could be implemented immediately to reduce the rate of ongoing migration of PFAS from the Base into the City's wellfield. The Governor closed his second letter stating that "Ohio EPA and the City of Dayton want to work cooperatively with WPAFB to address the PFAS contamination…a signed cooperative agreement would enable DOD/WPAFB to request a portion of the…$251 million…to be applied to the projects….Ohio looks forward to working with you."

30. In a letter dated January 18, 2021, DOD's Undersecretary of Defense for Acquisition and Sustainment responded to Ohio Governor DeWine's letters, rejecting his request for a cooperative agreement under the NDAA to address the PFAS contamination of the City of Dayton's wellfield.

### DENIAL OF THE CITY'S ADMINISTRATIVE FTCA DAMAGE CLAIM

31. As required under the FTCA, implementing regulations codified at 28 C.F.R. Part 14, and 32 U.S.C. § 842.79, the City submitted an administrative FTCA damage claim and addendum on March 19, 2020, to the DOD on behalf of the U.S. Department of the Air Force, Claims and Tort Litigation Division, at Joint Base Andrews, MD (Exhibit 1).

32. Under cover letter dated April 10, 2020, the Department of the Air Force

acknowledged receipt of the claim on March 27, 2020, and requested that the City submit documents evidencing the damages and the alleged responsibility of the United States therefor (Exhibit 2).

33. In response thereto, the City submitted extensive documents to support its claim, including monitoring and modeling data; correspondence to/from WPAFB and between WPAFB and Ohio EPA; costs and expenses for sampling and analysis of the PFAS contamination and for consultation with groundwater experts and their investigative services and reports; increased costs for production of water for treatment; and an estimate from the City's consultant of the cost of a treatment system to remove the PFAS contamination from the water entering the City's production wells.

34. Under cover letter dated November 4, 2020, the Department of the Air Force denied the City's administrative FTCA damage claim in its entirety (Exhibit 3).

## JURISDICTION AND VENUE

35. Under 28 U.S.C. §§ 1331, 1346(b)(1), and 2674, this Court has jurisdiction over the City of Dayton's FTCA claims.

36. Under 28 U.S.C. § 1402(b), venue is proper in this Court because the City resides in this judicial district, and because the acts and omissions alleged herein occurred in this judicial district.

## FIRST CLAIM FOR DAMAGES
### (Continuing Public Nuisance)

37. The City incorporates by reference herein allegations 1 through 36 of this Complaint.

38. The City of Dayton and its residents, businesses, and contract water customers have the common law right to a clean, safe, potable source of water of their own choosing.

39. Until sometime on or about 2016, the City supplied a clean, safe, potable source of water when it was discovered that PFAS contamination originating from WPAFB had migrated in groundwater under the Base, and into the City's sentinel wells for its Mad River Wellfield, at concentrations exceeding applicable federal and state drinking water standards and health advisory levels.

40. WPAFB knew of the contamination of its groundwater with PFAS at least as early as 2014, and consciously disregarded a known risk that the contamination had already migrated off-site and into the City's downgradient wellfield, or that such risk was imminent.

41. WPAFB knew, consciously disregarded, or in an exercise of reckless disregard should have known, that the location of its firefighting training centers and firefighting training exercises, and specifically the manner in which these activities were being carried out for decades, created a substantial risk that PFAS-containing AFFFs and residues would contaminate surface soils and sediments, stormwater runoff, and underlying groundwater, thus threatening the quality and safety of the sole source aquifer that the City relies upon for its drinking water supply.

42. WPAFB knew, consciously disregarded, or in an exercise of reckless disregard should have known, that an aquifer with the characteristics of that underlying its property would be highly susceptible to contamination from surface activities.

43. WPAFB knew, consciously disregarded, or in an exercise of reckless disregard should have known, that contamination of the aquifer would pose a substantial risk of harm to the City of Dayton and its water customers.

44. The acts and omissions of WPAFB unreasonably and significantly interfered with, and continue today to unreasonably and significantly interfere with, the common rights of the City of Dayton and its residents, businesses, and contract water customers, to a safe source of drinking

water of their own choosing, and have caused, and continue today to cause, detrimental effects on the public health, welfare, safety, comfort, and convenience of the residents and businesses in the City of Dayton, thus creating a public nuisance.

45. WPAFB has knowingly and deliberately failed to remove the PFAS contamination from the soils and groundwater underneath its property, and has knowingly and deliberately failed to take any steps to stop the ongoing migration of PFAS in groundwater from the Base and into the City's property, to wit, its Mad River wellfield production and sentinel wells, and its water supply, thereby (a) knowingly and deliberately continuing to unreasonably and significantly interfere with the common rights of the City's residents and businesses to a safe source of drinking water of their own choosing, and (b) knowingly and deliberately continuing to cause detrimental effects on the public health, welfare, safety, comfort, and convenience of the residents and businesses in the City, thus creating an ongoing public nuisance.

46. As a direct and proximate result of the conduct of WPAFB in creating an ongoing public nuisance, the City of Dayton has incurred substantial damages, which were presented to WPAFB in the City's administrative FTCA damage claim, but denied in their entirety.

## SECOND CLAIM FOR DAMAGES
(Continuing Trespass)

47. The City incorporates by reference herein allegations 1 through 46 of this Complaint.

48. The City of Dayton owns the Mad River Wellfield that was contaminated by the acts and omissions of WPAFB that led to PFAS contamination at the Base that has migrated into, and continues to migrate into today, the production and sentinel wells in the Wellfield, as well as the City's public water supply.

49. Under Art. I § 19b of the Ohio Constitution, the City has a protected property

interest in the groundwater that supplies raw water to its production wells for treatment and distribution to the City's residents, businesses and contract water customers.

50. Upon information and belief, WPAFB knows that PFAS contamination on its property exceeds applicable federal health advisory levels and recommended remediation guidelines at numerous locations, and that the contamination has migrated into the City's wellfield in concentrations above these levels.

51. The acts and omissions of WPAFB in causing PFAS contamination of its own property have caused the contamination to migrate, via surface soils and sediments, stormwater runoff, and groundwater, onto the City's property, interfering with its property rights, including the City's right to full use and enjoyment of its wellfield and production wells for the purpose of supplying water for treatment and distribution to residents, businesses and contract water customers. These acts and omissions of WPAFB created a trespass on the City's property and unlawful interference with the City's property rights.

52. WPAFB has not removed the contamination from the soils on, and the groundwater running under, its property, nor has it taken any steps to stop the ongoing migration of the PFAS contamination onto the City's property and into its production and sentinel wells, and into its water supply, thus creating an ongoing trespass against the City's property rights.

53. WPAFB retains control and authority to stop the ongoing trespass onto the City's property, but has knowingly and deliberately failed to exercise that control and authority.

54. As a direct and proximate result of the conduct of WPAFB in creating an ongoing trespass against the City's property, in the form of the ongoing PFAS contamination of the City's wellfield, the City of Dayton has incurred substantial damages, which were presented to WPAFB in the City's administrative FTCA damage claim, but denied in their entirety.

## PRAYER FOR RELIEF

WHEREFORE, based on the forgoing claims, the City of Dayton requests that the Court grant the City the following relief:

1. Award the City monetary damages for the continuing trespass and continuing public nuisance caused by the contamination of the City's public water supply and appurtenant structures (including its production and sentinel wells and treated and untreated water), up to the maximum dollar amount set forth in the City's administrative FTCA damage claim;

2. Order WPAFB to reimburse the City for its past, present and future costs to investigate, evaluate, and measure the contamination that continues to migrate into the City's wellfield, including the costs of employing outside consultants and testing labs for these tasks, up to the maximum dollar amount set forth in the City's administrative FTCA damage claim;

3. Order WPAFB to reimburse the City for its past, present and future costs to develop and implement a complicated, alternative pumping plan among the City's production wells, a plan necessitated in an effort to minimize the amount of PFAS contamination getting into untreated water that the City treats for supplying its residents, businesses, and contract customers, up to the maximum dollar amount set forth in the City's administrative FTCA damage claim;

4. Order WPAFB to pay for, or agree to reimburse the cost of, a treatment system to be installed at the City's water treatment plant to remove PFAS from the incoming, untreated water, up to the maximum dollar amount set forth in the City's administrative FTCA damage claim;

5. To the extent permissible under the FTCA, award the City its reasonable attorney fees and legal expenses incurred in evaluating the PFAS contamination and prosecuting these FTCA claims, up to the maximum dollar amount set forth in the City's administrative FTCA damage claim; and

6. Award the City such other relief as the Court deems just and proper.

Respectfully submitted,

*ss//Stephen N. Haughey*
Stephen N. Haughey (OH Bar No. 0010459)
Christina Wieg (OH Bar No. 0098693)
**FROST BROWN TODD LLC**
301 E. Fourth Street, Suite 3300
Cincinnati, Ohio 45202
(513) 651-6800
shaughey@fbtlaw.com
cwieg@fbtlaw.com
*Trial Counsel for Plaintiff City of Dayton, Ohio*

CO-COUNSEL:
John C. Musto (OH Bar No. 0071512)
Chief Trial Counsel
City of Dayton Department of Law, Civil Division
101 West Third Street
Dayton, OH 45401
(937) 333-4116
john.musto@daytonohio.gov

0105357.0730840   4837-9969-6615v1